**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**MICHAEL LEE GORDON,**

         **Petitioner,**

    **v.**                           **CASE NO. 2:06-cv-00065**

                                     **JUDGE HOLSCHUH**
**STATE OF OHIO,**                  **MAGISTRATE JUDGE KING**

         **Respondent.**

**<u>ORDER and
REPORT AND RECOMMENDATION</u>**

Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254.  This matter is before the Court on the instant petition, petitioner's memorandum and supplemental memorandum in support, respondent's motion to dismiss, Doc. No. 8,  petitioner's  responses thereto, respondent's reply, petitioner's exhibits in support of his claim of cause for failure to properly preserve his claims, and the exhibits of the parties.

Petitioner's unopposed request to amend the petition with additional claims of ineffective assistance of appellate counsel, *see Supplemental Memorandum in Support of 2254 Petition,* Doc. No. 7, is **GRANTED**.

For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.** Petitioner's request for an evidentiary hearing, Doc. No. 13, and his request for a stay of proceedings, *see* Doc. No. 9, are **DENIED**.

**I.  FACTS and PROCEDURAL HISTORY**

Petitioner was indicted by the May 4, 2001, term of the Franklin County grand jury on murder, in violation of O.R.C. §2903.02, two counts of manslaughter, in violation of O.R.C. §2903.04, felonious assault, in violation of O.R.C. §2903.11, kidnapping, in violation of O.R.C. §2905.01, aggravated robbery, in violation of O.R.C. §2911.01, and having a weapon while under disability, in violation of O.R.C. 2923.13, with specifications.   Exhibit A to Return of Writ.

The Ohio Tenth District Court of Appeals summarized the facts of this case and proceedings before the trial court as follows:

> According to the evidence at trial, the charges arose from events on the night of April 29, 1997, and continuing into the next morning. Most of the events took place at a house on Heyl Avenue in Columbus, Ohio, which belonged to Aaron Swank. Defendant arrived at the house with Swank and a third man who was not identified. These three men brought with them a fourth man, against his will. Swank held a gun to the man's head as they took him to the basement with his face covered. The third man then left after a few minutes.
>
> These events were witnessed by two women in the living room, and by Keaton Payne in the den. Payne went down to the basement where he observed defendant and Swank hitting the man they had forced into the house. Payne participated briefly in the hitting but then left the house.
>
> Stephanie Coleman and Dawn Barrowman, who were still upstairs, heard screams coming from the basement. They heard screams intermittently over a long period but eventually fell asleep. Coleman testified that the next morning, defendant woke her up and asked her to come downstairs and help clean up blood, but she refused. Barrowman testified that defendant told her that they had beaten the man, thrown his body into the trash, and killed him.
>
> On April 30, 1997, a sanitation worker picked up trash from dumpsters in an area including Heyl Avenue and the alley behind it, and dumped the trash at a facility on Jackson Pike. As the truck was dumping its contents, a worker saw a body in the trash. The dead body was later identified as Daniel Cole, who had been shot once in the head. More than a year later, police discovered evidence linking Michael Gordon and Aaron Swank to Cole's death. Defendant was

2

indicted on counts of murder, involuntary manslaughter, felonious assault, and kidnapping. The court appointed counsel to represent defendant, and the trial began in July 2002. However, a mistrial was declared when defendant's counsel responded to his client's criticisms by hitting him.

Before the second trial, the court appointed Terry Sherman to serve as counsel for defendant. Prior to trial, Sherman received permission to have Matt Zeiger assist him in the defense, and the trial began on February 11, 2003. Defendant was deemed to be a high-risk prisoner based on reports of altercations from jail officials and federal marshals, and he was therefore placed in leg shackles, with four deputy sheriffs on duty in the courtroom during defendant's appearances. In addition, a stun belt was placed around defendant's waist in lieu of fastening his shackles to the table.

During the trial, defendant frequently spoke up and addressed the court directly. At one point, defendant expressed the belief that Zeiger was causing a lack of communication between him and his attorney. Defendant said he felt his attorney was spending too much time talking with Zeiger, who was not experienced in trial practice. Defendant commented that it would be better to be *pro se* than to have Zeiger in between him and his attorney. Defendant was also upset at Sherman, who had "shushed" him during a witness's examination.

Sherman stated that he had not previously been made aware of any problem and that he believed the problem was that Zeiger was sitting in between him and defendant. He stated that he would change the seating arrangement so that his client was sitting next to him, and he provided writing materials so that his client could write down any questions he had during witnesses' examinations. Sherman asserted that Zeiger had done an excellent job on the opening statement, and the court commented that having Zeiger as an assistant was benefitting defendant rather than impeding his defense. Nonetheless, defendant insisted that Zeiger be taken off the case. Sherman then agreed that he would do all the witness examinations himself. The court denied leave for defendant to represent himself.

Defendant objected to the court's ruling, but the court explained the reasons for denying defendant's request to begin representing himself at that point in the proceedings, finding it improper under the circumstances to approve a waiver of counsel after the jury had been impaneled and defendant had been placed in jeopardy. Given that the

3

theme of the case had been established by defense counsel in the opening statement and that witnesses had already been examined by counsel, the court found a significant risk that jurors would make negative interpretations regarding counsel's withdrawal. The court further found there was no way to avoid that risk. The court concluded that a modification in the representation scheme would impair the fairness and impartiality of the trial. Moreover, the court lacked confidence in defendant's ability to adhere to the protocol, decorum, and rulings of the court that would be necessary to have an orderly trial.

The trial proceeded; however, after one recess, defendant refused to leave his cell adjacent to the courtroom. Sherman reported that defendant had expressed a desire to discharge him as counsel. The court held a hearing in the cell, and the defendant stated his reasons for refusing to enter the courtroom. The court explained that the courtroom was not equipped to transmit video or audio into the cell, and that to leave the door open between the courtroom and the cell could cause prejudice because the jury would observe that defendant was not merely absent but incarcerated. Defendant made a number of demands, including that he wanted to represent himself.

The court explained that his right to represent himself had changed significantly after the trial commenced. The court found that a "change in midstream * * * would be directly adverse to your interests in that the jury is going to wonder why that counsel are no longer with you during the trial." (Tr. 332.) Further, the court expressed concern that, because the trial was already in progress with a jury waiting to return from recess, defendant would not have sufficient time for adequate preparation, which would prejudice him. The court observed that a *pro se* defendant could intentionally create a situation that would result in a mistrial, and the court did not want to run that risk.

Defendant next asserted that his attorney had not done everything he was asked to do in preparing the defense. After additional discussion, defendant indicated that what he really wanted was to keep Zeiger out of the trial rather than proceed with no counsel at all:

That right there is leaving open the door for [Zeiger] to step in here. And that is the sole reason that I wanted to go *pro se* in the first place.
(Tr. 337.)

4

Defendant complained that Sherman was giving more attention to Zeiger's instruction than to consulting with defendant during trial and that Sherman was not asking questions that defendant wanted to have asked. The court instructed defendant to write down the questions that were not being asked so that the questions could be placed in the record. The defendant agreed to enter the courtroom but did not waive his objection to proceeding with counsel.

During the hearing, defense counsel responded to defendant's allegations, explaining among other things that he had subpoenaed every witness that defendant asked for, but that 90 percent of them had expressed hatred toward defendant, indicating that they wanted him to die. Sherman stated that there were two favorable witnesses, who would be called. He also noted that Zeiger was providing assistance without compensation. Finally, Sherman informed the court that defendant was simply trying to obtain another mistrial. However, Sherman indicated that this observation would not interfere with his representation of defendant and that he would continue to represent defendant with zeal and passion.

The trial proceeded, with Sherman serving as defense counsel. The jury ultimately found defendant guilty of felonious assault, involuntary manslaughter, and kidnapping, with specifications. Pursuant to a February 25, 2003 judgment entry, defendant was convicted of those offenses and sentenced.

***

During the trial, Richard Stolzenburg described how he and Cole were leaving a bar when Joe Platt approached Cole angrily and demanded that Cole leave with him. According to Stolzenburg, Cole had stolen drugs from Platt repeatedly.

Stephanie Coleman, who was in the Heyl Avenue house when defendant arrived, described how defendant entered the house with Swank and another man, forcing a skinny white guy into the basement with a gun to his head. Coleman was acquainted with defendant and identified him positively as one of the group. As to the man being forced into the house, she had a brief glimpse of his head before it was covered, and she testified that the victim had the same color and style of hair as Daniel Cole had in a photograph shown to her. Coleman described the screams coming from the basement and further testified that she was awakened the next morning by defendant, who asked her to clean up blood downstairs, which she

5

refused to do. (Tr. 269.) Coleman heard defendant say that, when he hit the victim, the screams were louder than when Swank kicked him.

Keaton Payne was also in the house when defendant arrived. Payne testified that he heard a commotion and saw Swank and others going into the basement. Payne was acquainted with defendant and identified him positively. He went to the basement and saw defendant and Swank hitting a smaller white man. He saw no one else in the basement. Payne testified that he joined in the beating for a short time but became scared and left. When shown a photo of Daniel Cole, Payne stated that he could not testify that Cole was the man being beaten in the basement but that they had the same hair color, hair length and style. Payne testified, however, that he did not get a good look at the victim's face in the basement.

Dawn Barrowman, who was in the room with Stephanie Coleman, testified that she witnessed a group of men come into the house, surrounding another person whose face was covered. She identified defendant as a friend since her childhood. She saw two people leave--Payne and one of the men in the group that had entered previously. She heard screams from time to time over a long period. Barrowman testified that in the morning, defendant first asked for Coleman's help in cleaning up blood and then asked Barrowman to help, but she also refused. Swank then drove Barrowman, Coleman, and defendant in his car to a medical building where Barrowman had an early appointment. Barrowman stated that in a conversation that morning, defendant and Swank told her that they had beaten the man, thrown his body into the trash, and killed him. She testified that Swank had threatened to hurt her and her family if she told anyone about the incident.

William Stierhoff, an employee of Swank's, testified that he was often at the Heyl Avenue house in April 1997 through July 1997 helping to care for Swank's 22 dogs, including numerous pit bulls, rottweilers, and dobermans. Stierhoff knew defendant as a friend and was also acquainted with Joe Platt as Swank's friend and a frequenter of his house on Heyl.

Stierhoff testified that he was at Swank's house one day when defendant was acting very upset. Among other topics that were discussed, defendant told Stierhoff how he and Swank had been hitting someone when Swank went further than defendant wanted to go. According to Stierhoff, defendant said they planned to beat the guy up, which they did, but then they threw the guy into a dumpster

6

> because they did not know what to do with him, and they shot him.
> According to Stierhoff's testimony, defendant said that Swank wanted
> him to shoot the guy but he did not want to, so Swank grabbed
> defendant's hand and put the gun in it and pulled the trigger with both
> of their hands on the gun. Stierhoff further described how, during his
> conversation with defendant, Swank came in and tried to prevent
> defendant from talking about the incident.

Exhibit F to Return of Writ. Petitioner was sentenced to an aggregate term of 28 years incarceration.

Exhibit C to Return of Writ. Represented by new counsel, petitioner filed a timely appeal. He

asserted the following assignments of error:

> I. THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS
> UNDER THE SIXTH AMENDMENT TO THE UNITED STATES
> CONSTITUTION AND ARTICLE ONE, SECTION TEN OF THE
> OHIO CONSTITUTION BY DENYING HIS MOTION TO
> REPRESENT HIMSELF PRO SE AT TRIAL.
>
> II. THE TRIAL COURT ERRED AND DEPRIVED APPELLANT
> OF DUE PROCESS OF LAW AS GUARANTEED BY THE
> FOURTEENTH AMENDMENT TO THE UNITED STATES
> CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE
> OHIO CONSTITUTION BY FINDING APPELLANT GUILTY OF
> INVOLUNTARY MANSLAUGHTER, FELONIOUS ASSAULT
> AND KIDNAPPING AS THOSE VERDICTS WERE NOT
> SUPPORTED BY SUFFICIENT EVIDENCE AND WERE ALSO
> AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

*Id*. On May 25, 2004, the appellate court affirmed the judgment of the trial court. *Id.* Petitioner

never filed a timely appeal of the appellate court's decision to the Ohio Supreme Court; however,

on September 13, 2004, he filed a motion for delayed appeal pursuant to Ohio Supreme Court Rule

of Practice II, Section 2(A)(4)(a). Exhibits G and H to Return of Writ. On October 27, 2004, the

Ohio Supreme Court denied petitioner's motion for delayed appeal and dismissed the appeal.

Exhibit I to Return of Writ. On August 4, 2004, petitioner filed a *pro se* application to reopen the

appeal pursuant to Ohio Appellate Rule 26(B). He asserted that he had been denied the effective

7

assistance of appellate counsel as follows:

>1.  Appellate counsel failed to raise ineffective assistance of trial counsel for not calling 12 of the 14 witnesses defendant wanted to testify.

>2.  Appellate counsel failed to raise [an issue regarding ] double jeopardy.

>3.  Appellate counsel failed to raise the denial of the lower court for defendant [sic] to be present at sidebar during trial.

>4.  Appellate counsel failed to raise the denial of the lower court to hold an in camera inspection of the information[al] summaries of testifying government witnesses and also the refusal to allow the defense to examine them prior to cross examination.

Exhibit J to Return of Writ.  On May 5, 2005, the state appellate court denied petitioner's Rule 26(B) application.  Exhibit N to Return of Writ.  Petitioner apparently never filed an appeal from that judgment.  Meanwhile, however, on July 6, 2004, petitioner filed a *pro se* petition for post conviction relief with the state trial court.  He asserted the following claims:

>1.  Ineffective assistance of trial and appellate counsel.

>2.  Defendant was prejudiced due to double jeopardy.

>3.  The defendant was denied [the right] to be present at every stage of the proceedings, including all acts and events between the time of commencement and the entry of judgment, specifically at side bar while real issues concerning the defendant were being held.

>4.  The defendant was denied the informational summaries of testifying government witnesses for impeachment and rebuttal purposes at trial, even though defendant's attorney made the request and... objected to the court's ruling.

Exhibit O to Return of Writ.  On September 3, 2004, the trial court denied the petition as barred under the doctrine of *res judicata*.  Exhibit Q to Return of Writ.  Petitioner apparently never filed an appeal from this decision to the state appellate court.

8

On January 26, 2006, petitioner filed the instant *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. He alleges that he is in the custody of the respondent in violation of the Constitution of the United States based upon the following grounds:

> 1. The trial court violated petitioner's rights under the Sixth Amendment to U.S. Constitution by denying his motion to represent himself pro se at trial.
>
> 2. The trial court violated petitioner's rights under the Fifth Amendment to the U.S. Constitution by denying his motion for dismissal at trial due to double jeopardy.
>
> 3. Petitioner was denied the effective assistance of counsel as guaranteed by the Sixth Amendment and [the] right to equal protection under the law.
>
> 4. The trial court violated petitioner's rights under the Sixth Amendment to the U.S. Constitution by denying him [the right] to be present at every stage of the proceeding[s] and [to] confront all witnesses against him.
>
> 5. Petitioner was denied informational summaries of testifying witnesses at trial.
>
> 6. The trial court violated petitioner's right to a fair trial by not recusing itself despite petitioner claiming bias.

On February 21, 2006, petitioner filed a supplemental memorandum in support of his §2254 petition, which this Court construes as a request to amend the petition, in which he asserts claims of ineffective assistance of appellate counsel for failing to raise the following issues on appeal:

> a. The trial court violated petitioner's rights under the Sixth Amendment to the U.S. Constitution by denying his motion to represent himself pro se at trial.
>
> b. The trial court violated petitioner's rights under the Fifth Amendment to the U.S. Constitution by denying his motion for dismissal at trial on double jeopardy grounds.
>
> c. The trial court violated petitioner's rights under the Sixth

9

Amendment to the U.S. Constitution by denying him [the right] to be present at every stage of the proceedings and to confront all witnesses against him.

d. Petitioner was denied informational summaries of testifying witnesses at trial.

*Supplemental Memorandum in Support of 2254 Petition,* Doc. No. 7.  Respondent has not objected to petitioner's request to include these claims of ineffective assistance of appellate counsel in this habeas corpus petition, and petitioner's request to amend the petition to include such claims is hereby **GRANTED.**

It is the position of the respondent that claims one through four and petitioner's claims of ineffective assistance of appellate counsel are procedurally defaulted.  Respondent has not separately addressed petitioner's allegations in claims five and six.

## II.  PROCEDURAL DEFAULT

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required fairly to present those claims to the highest court of the state for consideration.  28 U.S.C. §2254(b), ©).  If he fails to do so, but still has an avenue open to him by which he may present the claims, his petition is subject to dismissal for failure to exhaust state remedies.  *Id.; Anderson v. Harless*, 459 U.S. 4, 6 (1982)(*per curiam*); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).  If, because of a procedural default, the petitioner can no longer present his claims to a state court, he has also waived them for purposes of federal habeas review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error.  *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is precluded by the petitioner's failure to observe a state procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id.* Second, the Court must determine whether the state courts actually enforced the state procedural sanction. *Id.* Third, it must be decided whether the state procedural forfeiture is an 'adequate and independent' state ground on which the state can rely to foreclose review of a federal constitutional claim. *Id.* Finally, if the Court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error. *Id.* This "cause and prejudice" analysis also applies to failures to raise or preserve issues for review at the appellate level. *Leroy v. Marshall*, 757 F.2d 94 (6th Cir. 1985).

In claim one, petitioner asserts that he was denied the right to represent himself at trial. This claim is readily apparent from the face of the record, and was properly raised on direct appeal; however, petitioner failed to file a timely appeal of the appellate court's May 25, 2004, decision denying his appeal to the Ohio Supreme Court. Instead, on September 13, 2004, he filed motion for delayed appeal pursuant to Ohio Supreme Court Rule of Practice II, Section 2(A)(4)(a), which motion was summarily denied. The United States Court of Appeals for the Sixth Circuit has held that the Ohio Supreme Court's denial of a motion for delayed appeal under such circumstances constitutes an adequate and independent state ground to preclude federal habeas corpus review:

> The Ohio Supreme Court Rules require a motion for a delayed appeal
> to state "the date of entry of the judgment being appealed and

adequate reasons for the delay." Ohio Sup.Ct. R. II, Section 2(A)(4)(a). In addition, the motion must be accompanied by a supporting affidavit and a "copy of the decision being appealed." *Id.* A motion for a delayed appeal is not required to contain the actual claims and supporting arguments sought to be presented on appeal. *Id.* Instead, only when "the Supreme Court grants a motion for delayed appeal," is the appellant required to "file a memorandum in support of jurisdiction." Ohio Sup.Ct. R. II, Section 2(A)(4)©. Thus, the applicable Ohio court rules indicate that the denial of a motion for a delayed appeal is a procedural ruling, not a ruling on the merits....

We therefore conclude that Bonilla's grounds for relief have been procedurally defaulted. *See Simpson v. Jones,* 238 F.3d 399, 406 (6th Cir.2000). Bonilla failed to file a timely notice of appeal with the Ohio Supreme Court and his motion for leave to file a delayed appeal was denied by that court apparently because he failed to demonstrate adequate reasons for his failure to file a timely notice of appeal or to otherwise comply with the provisions of Ohio Sup.Ct. R. II, Section 2(A)(4). Where a state court is entirely silent as to its reasons for denying requested relief, we assume that the state court would have enforced any applicable procedural bar. *Simpson v. Sparkman,* 94 F.3d 199, 203 (6th Cir.1996).

*Bonilla v. Hurley,* 370 F.3d 494, 497 (6th Cir. 2004). Applying this standard, this Court therefore concludes that petitioner has procedurally defaulted claim one.

In claim two, petitioner asserts that his convictions violate the Double Jeopardy Clause; in claim three, petitioner asserts that he was denied the effective assistance of trial counsel because his attorney failed to call defense witnesses; in claim four, petitioner asserts that he was denied the right to confront witnesses against him; in claim five, petitioner asserts that he was improperly denied informational summaries of prosecution witnesses who testified against him. Petitioner first raised all these claims in his July 6, 2004, petition for post conviction relief pursuant to O.R.C. §2953.21. *See* Exhibit O to Return of Writ. However, he never filed a timely appeal of the trial court's September 3, 2004, denial of his post conviction petition to the state appellate court. Further, he may now no longer do so, as Ohio does not permit delayed appeals in post conviction proceedings.

*See State v. Nichols,* 11 Ohio St.3d 40, 43 (1984). Therefore, petitioner has waived claims two through five for federal habeas corpus review.

Petitioner properly presented his claims of ineffective assistance of appellate counsel, presented to this Court in petitioner's supplemental memorandum, in his application to reopen the appeal pursuant to Ohio Appellate Rule 26(B); however, he failed to file a timely appeal of the appellate court's May 5, 2005, decision denying that application to the Ohio Supreme Court. Again, he may now no longer do so, as Ohio does not permit delayed appeals in Rule 26(B) proceedings. *See Ohio v. Robinson*, 74 Ohio St. 3d 1518 (1996).

The Court notes that respondent, apparently inadvertently, failed to address petitioner's allegations in claims five and six. Further, procedural default is an affirmative defense that typically is waived if not raised in the first instance. *Trest v. Cain*, 522 U.S. 87, 89 (1997); *Gray v. Netherland*, 518 U.S. 152, 166 (1996). That said, while federal courts are not required to *sua sponte* raise the issue of procedural default, neither are they precluded from doing so. *See Elzy v. United States,* 205 F.3d 882, 886 (6th Cir. 2000), citing *Trest v. Cain, supra*, 522 U.S. at 87; *Rosario v. United States*, 164 F.3d 729, 732-33 (2nd Cir. 1998); *see also Day v. McDonough*, 126 S.Ct. 1675, 1682 (2006), noting that

> the Courts of Appeals have unanimously held that, in appropriate circumstances, courts, on their own initiative, may raise a petitioner's procedural default, *i.e.,* a petitioner's failure properly to present an alleged constitutional error in state court, and the consequent adequacy and independence of state-law grounds for the state-court judgment. *See Brewer v. Marshall,* 119 F.3d 993, 999 (C.A.1 1997); *Rosario v. United States,* 164 F.3d 729, 732 (C.A.2 1998); *Sweger v. Chesney,* 294 F.3d 506, 520 (C.A.3 2002); *Yeatts v. Angelone,* 166 F.3d 255, 261 (C.A.4 1999); *Magouirk v. Phillips,* 144 F.3d 348, 358 (C.A.5 1998); *Sowell v. Bradshaw,* 372 F.3d 821, 830 (C.A.6 2004); *Kurzawa v. Jordan,* 146 F.3d 435, 440 (C.A.7 1998); *King v. Kemna,* 266 F.3d 816, 822 (C.A.8 2001) (en banc); *Vang v. Nevada,* 329 F.3d

13

> 1069, 1073 (C.A.9 2003); *United States v. Wiseman,* 297 F.3d 975,
> 979 (C.A.10 2002); *Moon v. Head,* 285 F.3d 1301, 1315, n. 17
> (C.A.11 2002).

*Id.* This is especially true where, as here, petitioner has had the opportunity to respond to the arguments in support of procedural default. *Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005), citing *Lorraine v. Coyle*, 291 F.3d 416, 426 (6th Cir. 2002); *Elzy v. United States*, 205 F.3d at 886. The procedural default at issue in claim five is identical to that raised by the respondent as to claims two, three and four, to which petitioner has already presented lengthy arguments regarding cause for excusing the procedural default. In the interest of judicial economy, this Court will therefore also consider petitioner's procedural default of claim five.

Petitioner can still secure review of claims two through five on the merits if he demonstrates cause for his failure to follow the state procedural rules, as well as actual prejudice from the constitutional violations that he alleges. As cause for his procedural defaults, petitioner asserts that he was prevented from filing a timely appeal by prison officials. *See Traverse; Sur-Reply; Exhibits in Support of Cause for Procedural Default.*[1] Petitioner alleges that he was unable to file a timely appeal because prison officials denied him access to state law books or assistance by a legally trained individual, and denied him state case citations, the ability to make copies, paper, legal telephone calls, stamps, envelopes and other materials needed to access the courts. *See id., and exhibits attached thereto; see also Exhibits in Support of Cause,* Doc. No. 19.

> "'[C]ause' under the cause and prejudice test must be something
> external to the petitioner, something that cannot fairly be attributed

---

[1] It is not clear whether petitioner raises the issue of cause as to all his claims, or merely as to those claims that were raised in post conviction and 26(B) proceedings. In an abundance of caution, however, the Court will address petitioner's assertion of cause as to all of his procedurally defaulted claims.

14

> to him [;] ... some objective factor external to the defense [that] impeded ... efforts to comply with the State's procedural rule." *Coleman v. Thompson*, 501 U.S. 722, 753, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

*Maples v. Stegall*, 340 F.3d 433, 438 (6th Cir. 2003).  Petitioner may, for example, establish cause where he gives papers to prison authorities five days prior to the filing deadline, but prison authorities fail to promptly deliver the papers and petitioner's filing is denied as one day late.  *Id.,* at 438-39.  Petitioner's *pro se* status, or his ignorance of the law and the procedural requirements for filing a timely appeal, however,  are insufficient grounds to establish cause for a procedural default.  *See Bonilla v. Hurley*, 370 F.3d at 498.

Petitioner has submitted voluminous documents in support of his allegation that prison officials prevented him from filing a timely appeal.  These documents indicate that petitioner filed repeated complaints against prison officials alleging improper conduct of prison staff and denial of access to various materials needed to file legal documents.  The United States Supreme Court has held that prisoners must be  provided with meaningful access to the courts.  *Bounds v. Smith,* 430 U.S. 817, 828 (1977); *Knop v. Johnson,* 667 F.Supp. 467, 492 (W.D. Michigan 1987)(discussing requirements under *Bounds*), citing *Patterson v. Mintzes,* 717 F.2d 284, 288 (6th Cir. 1983); *Holt v. Pitts,* 702 F.2d 639, 640 (6th Cir. 1983).  Although inmates are not entitled to an unrestricted access to a law library or legal assistance, they are entitled to a "reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Lewis v. Casey,* 518 U.S. 343, 351 (1996).

Nothing in the record in this action supports petitioner's allegation that he was prevented from filing a timely appeal or denied access to the law library, legal assistance, telephone calls, stamps, paper, envelopes, or any other items needed to file a timely appeal of the trial court's

September 3, 2004, decision denying his petition for post conviction relief, or of the state appellate

court's May 25, 2004, decision denying his direct appeal or its May 5, 2005, decision denying his

Rule 26(B) application.  Many of the documents submitted by petitioner simply do not involve the

time period at issue.  Although petitioner alleges that he was unable to file a timely post conviction

appeal, on September 13, 2004, he filed a motion for delayed appeal from the state appellate court's

May 25, 2004, denial of his direct appeal.  *See* Exhibits G and H to Return of Writ.  Additionally,

petitioner's argument that he could not timely file an appeal because the prison refused to purchase

state law books on his behalf is unpersuasive.  *See Traverse*, *Exhibits to Traverse.*  Prison staff

advised petitioner that they would not purchase books on his behalf, but they provided petitioner

with the address of the Ohio Supreme Court so that he could obtain the information required to file

his appeal.  *See id.*  In any event, neither the Ohio Supreme Court nor Ohio's courts of appeals will

ordinarily consider claims not raised in the court below.  *State v. Issa*, 93 Ohio St.3d 49, 62 (2001),

citing *State v. Williams*, 51 Ohio St.2d 112 (1977); *State ex rel. Quarto Mining Co.*, 79 Ohio St.3d

78, 81 (1997)(citations omitted).  Therefore, further legal research to brief appeals to the Ohio

Supreme Court, or to the Tenth District Court of Appeals in post conviction proceedings would not

have been required to timely appeal.  Moreover, other documents submitted by petitioner in support

of his assertion of cause indicate, despite petitioner's protests to the contrary, that prison officials

provided him with adequate resources to access the courts.  *See Exhibits in Support of Cause*, Doc.

No. 14. For example, on April 5, 2004, regional director Scott Dodrill wrote to petitioner:

> [Y]ou state a search of your cell was conducted by staff at USP
> Allenwood and twenty-five (25) books of stamps were confiscated
> from you.... You are requesting three (3) books of stamps be returned
> to you and the option to mail the remaining twenty-two (22) books of
> stamps home.

An investigation into your appeal reveals that a search was conducted of your cell and 25 books of stamps were confiscated.  As the Warden explained, the institution determined you obtained all the stamps without proper authorization.  Your request to get three books of stamps shows that you were aware that an inmate is not to possess more than three books of stamps.  You will not be permitted to mail the excess out of the institution because any amount in excess of three books is contraband....

*Id.*  On April 19, 2005, Warden Troy Williamson wrote:

This is in response to your request for administrative remedy in which you allege your assigned counselor denied you access to the courts by withholding your legal mail from the United States District Court for the District of Columbia.  Further, you assert you riled an untimely appeal of a court order due to the actions of your counselor.  As relief, you demand a full investigation into the alleged unprofessional actions of your counselor and want him reprimanded.

A review into your allegations reveals you received legal mail from the above court, on March 4, 2005, which informed you that Case No. 05-0229 was to be transferred from the United States District Court for the District of Columbia to the United States District Court for the Middle District of Pennsylvania.  The court order... explained the court's reasoning for transferring the case, as well as instructions for you to appeal the order by filing a motion to request the case remain within the District of Columbia court.  No imminent deadline was
 provided for the filing of this motion.  Further,... the Clerk of Court indicates that no record exists indicating you ever filed a motion to appeal the Judge's order, despite your assertion to the contrary.  The Clerk of the Court stated that you could still file a motion seeking to have the case returned to the jurisdiction of the District of Columbia Court.

*Id.*  On May 2, 2005, Dodrill wrote:

[Y]ou state on January 28, 2005, staff at USP Allenwood came to your cell, advised you that you had legal mail, and requested you sign for the legal mail.  You state you advised staff you were not required to sign for your legal mail.  You state staff confiscated your legal mail and held it for four days....  You request the staff member to be reprimanded.

17

***

A review of your concerns indicate on February 28, 2005, staff attempted to deliver your legal mail to you; however, you refused to take possession of the mail or sign for it. On March 1 and March 4, 2005, a second and third attempt was made to provide you with your legal mail. You again refused to accept the document or sign for it. On March 4, 2005, you finally took possession of your legal mail. You still refused to sign for the document; therefore, a notation was made in the logbook of your refusal. You were provided a confiscation form to advise you that your legal mail would be returned to the court if not accepted. The untimely delivery of your legal mail was the result of your continued refusal to take possession of the documents.

*Id*. On May 6, 2005, Williamson wrote:

8.5 x 11" writing paper is offered on a regular basis to SHU inmates at no cost. In addition, if you have a documented legal issue pending, arrangements can be made with your unit team to purchase up to 4 legal envelopes. However, your unit team will retain these envelopes for you and upon your request, deliver them to the SHU when you have legal documentation to be mailed.

*Id.* On May 10, 2005, Williamson again wrote:

This is in response to your request for administrative remedy in which you claim the education department is denying you writing paper, letter and legal size envelopes, and access to program statements.

An investigation into this matter revealed the education department has given you writing paper on several occasions. However, if the amount you receive is insufficient, additional paper can be purchased in the Commissary. The education department does not provide the inmate population with letter and legal sized envelopes. These items can also be purchased in the Commissary.

If you are indigent, it is your responsibility to contact a member of your unit team and they will assist you in obtaining these items....

*See id.* On June 23, 2005, Dodrill again wrote:

18

> [Y]ou claim education staff at USP Allenwood lost your personal legal materials after you asked them to copy the materials. You state the documents were to be sent to the courts and belonged to you. You request the legal materials be returned.
>
> A review of your appeal reveals the legal materials in question, a case law table, was misplaced and education staff made a diligent effort to replace the document. However, you failed to provide staff with the information needed to do so. Even if the document did not belong to another inmate as you claim, you still have not provided the information needed, specifically the title or subject of the case law table, to education staff. We also note you are not longer housed in the special housing unit and can avail yourself to a copier machine to make your own copes. Accordingly, appeal is denied.

*Id.* On July 8, 2005, Watts wrote:

> You state you need copies of legal materials made, and that staff has denied your request for such. You request that staff make these copies.
>
> ... Staff indicates they have informed you that to obtain such copies, you need only submit a request to the education department. You have refused to do so, threatening to "bury" staff in paperwork for requiring that you submit a request to the education department....

*Id.* Although the Court will not repeat herein the contents of all of the documents submitted by petitioner in support of his allegation of cause, simply put, nothing therein reflects that any "objective factor external to the defense impeded" petitioner's ability to comply with the state procedural rules. *See Maples v. Stegall, supra*, 340 F.3d at 438 (citation omitted). After exhaustive review of the record, the Magistrate Judge concludes that petitioner has failed to establish cause for the procedural default of his claims.

Beyond the four-part *Maupin* analysis, this Court is required to consider whether this is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 47 U.S. at 491; *see also Sawyer v. Whitley*, 505 U.S.

333. Petitioner asserts that he is actually innocent in view of exculpatory blood DNA evidence and alibi witnesses who would have testified on petitioner's behalf. *See Traverse*, Doc. No. 9. Specifically, petitioner contends that, although prosecution witnesses testified that petitioner asked them to help clean up Daniel Cole's blood from the basement of the house, police were unable to detect the presence of any human blood in the basement after conducting tests. Petitioner has submitted a copy of a report by Detective Ralph Taylor which indicates:

> Using an alternate light source, Luminol and Benzidine swabs, the technicians conducted several tests on the basement walls, floor and steps as well as other items in the basement to determine whether any human blood could be detected. The Crime Lab personnel advised that after the areas had been sprayed with the Luminal and the alternate light source had been turned on the areas, the items should fluoresce or glow if any body fluids such as blood, semen and saliva were present.

> It should be noted that during the period of time that the suspect, Aaron Swank was residing at 975 Heyl Avenue, he kept several large dogs in the basement area of this residence. Portions of the basement floor were covered with animal feces and urine. Also observed laying on the floor was the skeleton of a cat.

> After the basement floor had been sprayed with Luminal and the Benzidine swabs had been used in certain areas, the alternate light source was used. The Lab technicians stated that the entire basement floor glowed or fluoresced; therefore, this testing met with negative results. Due to the condition of the basement floor, the technicians were unable to detect human blood.

*Exhibits to Traverse, Doc. No. 9.* Petitioner has also submitted an affidavit from Mikaly Jo Paolucci in which Paolucci indicates that she was not subpoenaed as a defense witness, but would have testified that petitioner was with her during the time period that Cole's murder took place. *See id.*

> The United States Supreme Court has held that if a habeas petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the

20

> petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup,* 513 U.S. at 316, 115 S.Ct. 851. Thus, the threshold inquiry is whether "new facts raise[ ] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial." *Id.* at 317, 115 S.Ct. 851. To establish actual innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327, 115 S.Ct. 851. The Court has noted that "actual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States,* 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup,* 513 U.S. at 324, 115 S.Ct. 851. The Court counseled however, that the actual innocence exception should "remain rare" and "only be applied in the 'extraordinary case.' " *Id.* at 321, 115 S.Ct. 851.

*Souter v. Jones*, 395 F.3d 577, 589 (6th Cir. 2004)(footnote omitted).  Petitioner has failed to meet this standard.

### III.  CLAIM SIX

In claim six, petitioner asserts that he was denied a fair trial because the trial court failed to recuse itself.  Again, although respondent did not raise the issue, claim six is plainly procedurally defaulted, as petitioner never presented this claim to the state courts.

In any event, petitioner has failed to provide any additional factual basis for his allegation in claim six.  Claim six, therefore is without merit.

### IV.

For all of the foregoing reasons, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**  Petitioner's request for a stay of proceedings so that he may exhaust state court remedies, *see* Doc. No. 9, is **DENIED,** as is petitioner's request for an evidentiary hearing, Doc. No.

13.

If any party objects to this *Report and Recommendation*, that party may, within ten (10) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation*. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

October 3, 2006          *s/Norah McCann King*

                                     Norah McCann King
                               United States Magistrate Judge